UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE:<br><br>COLLIER LAND & COAL DEVELOPMENT, LP,<br><br>     Debtor.<br><hr>PARKVALE BANK,<br><br>     Movant(s),<br><br>v.<br><br>COLLIER LAND & COAL DEVELOPMENT, LP,<br><br>     Respondent(s). | Bankr. No. 10-22059-MBM<br><br>Chapter 11<br><br>Judge M. Bruce McCullough<br><br><br>Related to Doc. No. 51<br><br>Hearing Date: July 13, 2010<br>Hearing Time: 1:30 p.m. |

**RESPONSE TO PARKVALE BANK'S MOTION (1) TO PROHIBIT OR CONDITION THE USE OF CASH COLLATERAL; (2) TO COMPEL ADEQUATE PROTECTION; AND/OR (3) FOR RELIEF FROM THE AUTOMATIC STAY**

AND NOW, Collier Land & Coal Development, LP ("Debtor"), by and through its undersigned counsel, Bernstein Law Firm, P.C., files this Response to Parkvale Bank's Motion (1) To Prohibit Or Condition The Use Of Cash Collateral; (2) To Compel Adequate Protection; And/Or (3) For Relief From The Automatic Stay, stating as follows:

**<u>Background</u>**

1. The Debtor owns 57.8 acres of real estate in Collier Township, Pennsylvania (the "Real Estate").

2. The Debtor began its operations in 2007 with the intention of mining the coal on the Real Estate and then subdividing the land and selling approximately 59 buildable lots to developers.

3.      In March 2007, Skelly and Loy, an engineering and environmental consulting firm, did an independent technical evaluation of the Debtor's property and proposed mining operations. A true and correct copy of Skelly and Loy's report is attached hereto as Exhibit A.

4.      Skelly and Loy concluded that Debtor's property contains approximately 2.43 million tons of salable coal.

5.      Skelly and Loy further concluded that the equipment Debtor purchased (discussed below) was suitable to allow Debtor to mine approximately 20,000 tons of coal per month, to be sold at "spot prices" of approximately $40 per ton.

6.      Debtor was primarily financed through $15 million in equity investments made by various partners.

7.      From the end of 2007 through the last quarter of 2009, Debtor navigated the myriad of rules, regulations, bonding and permitting required to begin mining coal in Pennsylvania.

8.      On October 24, 2008, November 26, 2008, and March 30, 2009, Debtor and Parkvale entered three (3) promissory notes (the "Notes"), totaling approximately $2.77 million. The Notes allowed Debtor to purchase over $2.7 million in mining equipment (the "Equipment").

9.      The Notes are secured by, *inter alia*, all of the Debtor's mining Equipment. Additionally, as security for the Notes, Debtor assigned a money market investment account worth $845,000 to Parkvale (the "Money Market Account").

10.      In the last quarter of 2009, shortly after receiving final permits to mine coal, Debtor removed timber from the Real Estate, thereby finalizing the land for coal mining.

11.     During the first quarter of 2010, Debtor finally began mining coal. Despite the winter conditions, which are not ideal for coal mining, Debtor produced revenue in the approximate amount of $50,000 in January and February, 2010.

12.     However, in February, 2010, the severe snowstorms that hit Western Pennsylvania shut down the Debtor's mining operations for several weeks.

13.     Debtor's original agreement with Parkvale was that a portion of the Money Market Account would be released as Debtor made principal payments on the Notes. However, the actual Notes did not reflect this agreement. When Debtor requested that Parkvale release approximately $82,000 from the Money Market Account (to be used to make a payment to Parkvale on the Notes), Parkvale refused. Upon realizing that Parkvale did not intend to honor its agreement to release a portion of the Money Market Account, Debtor filed an action in equity in the Court of Common Pleas of Allegheny County, Pennsylvania (the "Equity Action") and immediately began seeking a loan that would fund a buyout of Parkvale's interest.

14.     In response to the Equity Action, in March, 2010, Parkvale declared Debtor to be in default of the Notes. Debtor disputes that it was in default of the Notes and has filed an adversary proceeding, Adv. Proc. No. 10-2206, seeking equitable relief, including an order preventing Parkvale from declaring the Debtor in default of the Notes.

15.     Upon declaring Debtor to be in default of the Notes, Parkvale entered judgment against the Debtor, swept the $845,000 Money Market Account, and levied on the collateral.

16.     As part of execution on its judgment, Parkvale also instructed the Sheriff of Allegheny County Pennsylvania to levy on Debtor's Real Estate and padlock the Debtor's mining location, forcing the Debtor into bankruptcy and destroying any reasonable chance Debtor had to obtain traditional financing to pay off Parkvale's claim.

17.     Debtor filed its chapter 11 petition shortly thereafter on March 25, 2010.

18.     However, Debtor was locked out of its facility for nearly one week during which it rained heavily for several days. Typically, Debtor pumps the water out of the mine as it rains to avoid flooding that causes damage to the structure of the mine and the coal itself. However, when Debtor was locked out of its location, Debtor was unable to pump water out of the mine. Consequently, the effects of the lockout were felt for several weeks during which Debtor was forced to take corrective actions to repair the mine. During this time, Debtor was unable to mine coal.

19.     After repairing the mine in mid-April, Debtor then turned its attention to mining and selling coal. Debtor delivered a portion of the "first cut" of coal in late-April 2008 to Targe Energy Coal, LLC. [1] However, due to water damage that reduced the quality of the coal, the coal was not considered suitable by the buyer and was rejected.

20.     Additionally, in early May, 2010, Debtor experienced a delay due to malfunction of its largest bulldozer. All of the Equipment remains under a four year, 7,000 hour warranty and, when necessary, is being serviced by Highway Equipment Company. The bulldozer was fixed shortly thereafter.

21.     Debtor has since mined additional first-cut coal and sold it to Targe Energy Coal, LLC. In early June, 2010, Debtor received approximately $16,270 in revenue from the original "first cut" coal sales.

22.     Only beginning in mid-June has Debtor been able to *begin* mining its main seam of coal and only once this coal is sold will Debtor be able to realize substantial and consistent revenues.

---

[1] "First cut" is typically the coal that runs at the outer edges of a coal seam. First cut is often of lesser quality than "main seam" coal and is, therefore, sold at a significantly lower price.

23.     Moreover, the aforementioned delays prevented the Debtor from obtaining a dedicated buyer of its coal. Debtor was obviously hesitant to commit to selling a specific tonnage of coal until the aforementioned delays and issues were resolved.

24.     However, Debtor has met with four (4) interested parties regarding the purchase of Debtor's coal.

25.     Debtor is currently in negotiations with Targe Energy Coal, LLC regarding the purchase of Debtor's coal. Targe has visited the Debtor's operations and taken samples of the main seam coal. Upon completion of lab analysis of the samples, Debtor expects to enter an agreement for the sale of coal with Targe, either through a contract or on a purchase order basis.

26.     Parkvale is Debtor's only secured creditor and has a claim in the approximate amount of $1.6 million, after accounting for the $845,000 Parkvale received in March, 2010. It is noteworthy that Debtor has only one other creditor of any substantial amount – Highway Equipment Company – and that Debtor disputes Highway Equipment Company's claim. In other words, Parkvale's claim is potentially the only claim in this bankruptcy case of any significance.

27.     Debtor values its real estate to be *at least* $3 million, *excluding* the value of the coal located thereon, which itself is worth at least $8 million, and values the Equipment at approximately $2 million.

28.     On June 20, 2010, Parkvale filed its Motion (1) To Prohibit Or Condition The Use Of Cash Collateral; (2) To Compel Adequate Protection; And/Or (3) For Relief From The Automatic Stay (the "Motion").

29.     For the reasons set forth below, Parkvale's interests in Debtor's property are adequately protected, Debtor should be entitled to use cash collateral, and Parkvale is not entitled to relief from the automatic stay or adequate protection payments.

## **Objection to Adequate Protection Payments/Relief from the Automatic Stay**

30.     If a creditor objects to a debtor's use of cash collateral then the bankruptcy court "shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e).

31.     A debtor may provide adequate protection through periodic cash payments, replacement liens, or "the indubitable equivalent" of the creditor's interest. 11 U.S.C. § 361.

32.     Some courts have found that adequate protection is satisfied when a debtor reinvests the cash collateral in the operation and maintenance of the business "because the value of the secured creditor's interest in its collateral will thereby be increased." E.g., Fed Nat'l Mortgage Ass 'n v. Dacon Bolingbrook Assocs. Ltd. P'ship, 153 B.R. 204, 214 (N.D. Ill. 1993) (citing In re Constable Plaza Assoc., 125 B.R. 98, 105 (Bankr. S.D.N.Y. 1991)). Others have found adequate protection satisfied when the property securing the secured creditor's claim is worth more than the claim itself – i.e. when the debtor has an "equity cushion" in the subject property. E.g., In re Markos Gurnee P'ship, 252 B.R. 712, 716-17 (Bankr. N.D. Ill. 1997) (citing In re James Wilson Assoc., 965 F.2d 160, 171 (7th Cir. 1992)). Collateral is valued "in light of the purpose of the valuation and of the proposed disposition or use of such property." 11 U.S.C. § 506(a). An  asset's value depends on the price that could be agreed by willing buyers and sellers negotiating for a replacement. United Air Lines, Inc. v. Reg'l Airports Improvement Corp., 564 F.3d 873, 875 (7th Cir. 2009) (citing Assocs. Commercial Corp. v. Rash, 520 U.S. 953 (1997)).

33.     "Case law has almost uniformly held that an equity cushion of 20% or more constitutes adequate protection." Mendoza v. Temple-Inland Mortg. Corp. (In re Mendoza), 111 F.3d 1264, 1272 (5th Cir. Tex. 1997) (quoting In re Kost, 102 B.R. 829, 831 (Bankr. D. Wyo.

1989)). <u>See also</u>, <u>In re Knight Energy Corp.</u>, 2009 Bankr. LEXIS 1841, 2009 WL 1851739, at *3 (Bankr. N.D. Tex. 2009) (applying the 20% equity cushion test to determine whether the secured lender was adequately protected).

34.     In this case, Parkvale's $1.6 million claim is secured by first priority liens against Equipment that has a value of approximately $2 million *and* Real Estate that is worth, at least, $3 million, excluding the value of the coal thereon, which itself is valued at a minimum of $8 million.

35.     With respect to the Equipment, Debtor purchased all of the Equipment new from Highway Equipment Company in August 2008 for approximately $2.6 million. Since that time, the Debtor has only used the Equipment sparingly at the end of 2009 and early 2010. Only in the last two months has Debtor used the Equipment consistently. The Equipment remains under a 4-year, 7,000-hour warranty. Therefore, Debtor's belief that the Equipment is worth approximately $2 million is well founded.

36.     Parkvale does not dispute that Debtor's property exceeds Parkvale's claim and, in paragraph 23 of its Motion, admits that liquidation of Debtor's assets would result in creditors being *paid in full*.

37.     Debtor is using the cash collateral exclusively for operating purposes and none of the Debtor's insiders, including its president and general manager, Hugh McHugh, are receiving salaries or any money from the Debtor whatsoever.[2] In fact, Debtor is currently using Parkvale's cash collateral to get its mining operations up-and-running so that it can obtain dedicated buyers of its coal and, at some point, pay off Parkvale through a plan of reorganization.

---

[2] In lieu of salary, Debtor was previously paying a monthly car lease to Lexus Financial Services in the amount of $1,400 per month for a vehicle used by Mr. McHugh. However, that lease expires in July 2010 and no more payments will be made after its expiration, nor will Mr. McHugh receive a salary.

38.     Moreover, ***less than four months ago***, Parkvale received $845,000 –
approximately 14 months worth of Note payments and nearly one third (1/3) of the original total
principal balance - from the Money Market Account.

39.     In its Motion, Parkvale makes much of the fact that Debtor produced limited
revenue over the first three (3) months of the bankruptcy case.

40.     While this is true, Parkvale ignores (1) the fact that Debtor's mining operations
were in their infancy when Parkvale declared Debtor to be in default of the Notes; (2) that the
post-bankruptcy delay in mining and selling coal is a product of Parkvale's own creation because
had Parkvale not caused Debtor to be locked out of its operations, Debtor would not have wasted
weeks pumping water from the mine and making repairs to the mine and could have instead been
mining and selling coal; and (3) the fact that most businesses expect to generate small revenues
in the first few months of *full* operation.

41.     In the last sixty days, Debtor has finally begun the process of consistently mining
and selling coal.

42.     The relief sought in Parkvale's Motion would deprive the Debtor of the ability to
realize the "breathing space" that Bankruptcy is supposed to provide a debtor seeking to
reorganize.

43.     Debtor has a viable business plan, substantial assets, and very limited debts.

44.     Nothing about this case suggests that Parkvale is not being adequately protected.
Due to the Debtor's substantial equity in the Equipment and Real Estate, and in light of the fact
that Parkvale recently received $845,000 and setoff same against the principal amount due under
the Notes, Debtor believes that Parkvale is adequately protected.

45.     At the very least, Debtor believes that it should be granted an evidentiary hearing on the issue of adequate protection as well as a trial in its adversary proceeding against Parkvale. To grant Parkvale adequate protection or relief from stay at this juncture would simply be premature.

46.     To be clear, Debtor is not arguing that it should be permitted to operate in bankruptcy without making payments to Parkvale indefinitely. Rather, Debtor believes that a breathing period to get its business operations on track before being forced to make adequate protection payments to Parkvale is supported by the facts of this case.

47.     For all of the foregoing reasons, Debtor requests that the Court deny Parkvale's Motion.

WHEREFORE, Collier Land & Coal, LP, respectfully requests that this Honorable Court enter an Order denying Parkvale Bank's Motion (1) To Prohibit Or Condition The Use Of Cash Collateral; (2) To Compel Adequate Protection; And/Or (3) For Relief From The Automatic Stay.

Dated: July 6, 2010                                   Respectfully submitted,

                                                      BERNSTEIN LAW FIRM, P.C.,

                                                      By: /s/ *Scott E. Schuster*
                                                      Scott E. Schuster, Esq.
                                                      Pa. Id. No. 203766
                                                      707 Grant Street, 2200 Gulf Tower
                                                      Pittsburgh, PA 15219
                                                      sschuster@bernsteinlaw.com
                                                      (412) 456-8119 (phone)
                                                      Attorney for Debtor