| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT<br>WESTERN DISTRICT OF PENNSYLVANIA | |
| IN RE:<br><br>COLLIER LAND & COAL DEVELOPMENT, LP.,<br><br>    Debtor.<br><br>---<br><br>NO MOVANT,<br><br>    Movant(s),<br><br>v.<br><br>COLLIER LAND & COAL DEVELOPMENT, LP,<br><br>    Respondent(s). | Bankr. No. 10-22059-MBM<br><br>Chapter 11<br><br>Judge McCullough<br><br>Related to Doc. No. 120<br><br>Hearing Date: November 23, 2010<br>Hearing Time: 1:30 p.m. |

**RESPONSE TO RULE TO SHOW CAUSE WHY CASE SHOULD NOT BE CONVERTED TO CHAPTER 7 FOR FAILURE OF THE DEBTOR TO FILE DISCLOSURE STATEMENT AND PLAN**

AND NOW, comes Collier Land & Coal Development, LP ("Debtor"), by and through its undersigned counsel, the Bernstein Law Firm, P.C., and files this Response to Rule to Show Cause Why Case Should Not Be Converted To Chapter 7 For Failure Of The Debtor To File Disclosure Statement And Plan, stating as follows:

**Background**

1. The Debtor owns 57.8 acres of real estate in Collier Township, Pennsylvania (the "*Real Estate*").

2. The Debtor began its operations in 2007 with the intention of mining the coal on the Real Estate and then subdividing the land and selling approximately 59 buildable lots to developers.

3. Debtor was primarily financed through $15 million in equity investments made by various partners.

4. From the end of 2007 through the last quarter of 2009, Debtor navigated the myriad of rules, regulations, bonding and permitting required to begin mining coal in Pennsylvania.

5. On October 24, 2008, November 26, 2008, and March 30, 2009, Debtor and Parkvale Bank ("*Parkvale*") entered three (3) promissory notes (the "*Notes*"), totaling approximately $2.77 million. The Notes allowed Debtor to purchase over $2.7 million in mining equipment (the "*Equipment*"). The Notes are secured by, *inter alia*, all of the Debtor's mining Equipment. Additionally, as security for the Notes, Debtor assigned a money market investment account worth $845,000 to Parkvale (the "*Money Market Account*").

6. In the last quarter of 2009, shortly after receiving final permits to mine coal, Debtor removed timber from the Real Estate, thereby finalizing the land for coal mining.

7. During the first quarter of 2010, Debtor finally began mining coal. However, in February, 2010, the severe snowstorms that hit Western Pennsylvania shut down the Debtor's mining operations for several weeks.

8. In March, 2010, Parkvale declared Debtor to be in default of the Notes. Upon declaring Debtor to be in default of the Notes, Parkvale entered judgment against the Debtor, swept the $845,000 Money Market Account, and levied on the collateral.

9. As part of execution on its judgment, Parkvale also instructed the Sheriff of Allegheny County Pennsylvania to levy on Debtor's Real Estate and padlock the Debtor's mining location, forcing the Debtor into bankruptcy.

10. Debtor filed its chapter 11 petition shortly thereafter on March 25, 2010 (the "***Petition Date***").

11. Debtor had several setbacks during the initial stages of the bankruptcy case. Prior to the Petition Date, Debtor was locked out of its facility by the Sheriff for nearly one week during which it rained heavily for several days. Typically, Debtor pumps the water out of its mine as it rains to avoid flooding that causes damage to the structure of the mine and the coal itself. However, when Debtor was locked out of its location, Debtor was unable to pump water out of the mine. Consequently, the effects of the lockout were felt for several weeks during which Debtor was forced to take corrective actions to repair the mine. During this time, Debtor was unable to mine coal.

12. After repairing the mine in mid-April, Debtor then turned its attention to mining and selling coal. Debtor had nominal coal sales during the months of May, June, July, and August, 2010.

13. Debtor was unable to turn a profit and/or generate sufficient monthly income to fund a feasible plan of reorganization. Throughout the bankruptcy case, the limited partners of the Debtor funded the company's business operations through equity contributions. Debtor's President, Hugh F. McHugh, has continued to work on behalf of the company on a full-time basis despite having not received a yearly salary since the company's inception.

14. In September 2010, Debtor decided that it was unable to continue to fund its coal operations, stopped mining coal and, instead, turned its full attention to selling the Debtor's assets for an amount sufficient to pay creditors in full.

15. Debtor values its real estate to be *at least* $3 million, *excluding* the value of the coal located thereon, which itself Debtor believes to be worth at least $8 million, and values the

Equipment at approximately $2 million. In short, Debtor believes that its assets can be sold for significantly more than the aggregate amount of Debtors' debts.

16. Debtor has four primary creditors – Parkvale Bank, Highway Equipment Company, Ford Motor Credit, and Padco Financial Services, Inc. - all of which claim a security interest in Debtor's property and all of which appear to be adequately protected by the value of Debtors' assets.

17. The remainder of Debtor's trade creditors hold small unsecured claims, the largest of which is only approximately $1,400.

18. For the past several months, Debtor has marketed its assets to potential buyers. However, because of Debtor's status as a coal mine – which carries potential environment concerns – buyers have required substantial time to conduct "due diligence" and, unfortunately, the sale process has proceeded somewhat slower than Debtor anticipated.

19. Nevertheless, Debtor's principal, Hugh McHugh, and one of Debtor's limited partners, Dr. James Warren, have spent an untold number of hours discussing the company, its assets, and the prospects of a sale with numerous interested buyers.

20. In fact, Debtor has nearly finalized the terms of an agreement with one such prospective buyer and Debtor believes that a sale will occur within the next sixty (60) days, and perhaps much sooner.

21. Debtor and its investors believe that they will succeed in filing a motion to approve a sale of substantially all of its assets and corresponding plan of liquidation within sixty (60) days.

22. Debtor does not believe that any of its creditors will be harmed by this short delay, because most of Debtor's significant creditors are secured by equipment. In fact, Debtor's

largest secured creditor – Parkvale Bank – has received relief from the automatic stay and can, if it chooses, protect its own interests by pursuing its rights in the Debtor's Real Property and Equipment.

23. On the other hand, Debtors unsecured creditors will likely be harmed by a piecemeal liquidation through Chapter 7 and will likely only benefit from a consensual sale of the Debtor's assets.

24. A chapter 7 conversion will also greatly harm Debtor's shareholders. Debtor's investors have collectively invested nearly four (4) years of effort and more than $15 million in cash and assets into the company and continue to believe that the company has assets far exceeding the total amount of its debts.

25. Debtor has specifically instructed the undersigned counsel to attach a letters to the Court from Debtor's President Hugh F. McHugh and Dr. Jim Warren, one of Debtor's largest shareholders. Those letters are attached as Exhibits A and B hereto.

26. A conversion of this chapter 11 case to a chapter 7 proceeding would destroy any equity the shareholders have in the company.

27. Therefore, Debtor requests until January 23, 2011 to file a sale motion and plan of liquidation and that the Court does not convert this Chapter 11 case to Chapter 7 until after the January 23, 2011.

Dated: November 16, 2010

Respectfully submitted,

BERNSTEIN LAW FIRM, P.C.,

By: /s/ *Scott E. Schuster*
Scott E. Schuster, Esq.
Pa. Id. No. 203766
707 Grant Street, 2200 Gulf Tower
Pittsburgh, PA 15219
sschuster@bernsteinlaw.com

(412) 456-8119 (phone)  
(412) 456-8273 (fax)